STATE of Wisconsin, Plaintiff-Appellant-Petitioner,

v.

Lisa ORTA, Defendant-Respondent.

STATE of Wisconsin, Plaintiff-Appellant-Petitioner,

v.

Ricardo RUIZ, Defendant-Respondent.

Supreme Court

*Nos. 97–3105–CR, 97–3106–CR. Oral argument September 10, 1999.—Decided January 19, 2000.*

2000 WI 4

(Also reported in 604 N.W.2d 543.)

For the plaintiff-appellant-petitioner the cause was argued by *Stephen W. Kleinmaier*, assistant attorney general, with whom on the brief was *James E. Doyle*, attorney general.

For the defendant-respondent, Lisa Orta, there was a brief by *Mark F. Nielsen* and *Schwartz, Tofte & Nielsen, LTD.*, Racine and oral argument by *Mark F. Nielsen*.

For the defendant-respondent, Ricardo Ruiz, there was a statement by *Michael P. Reisterer, Jr.* and *Reisterer Law Office*, Kalamazoo, MI, that they adopt the brief of Lisa Orta.

Amicus curiae brief was filed by *Mary E. Waitrovich*, assistant state public defender and *Nicholas L. Chiarkas*, state public defender for the State Public Defender.

Amicus curiae brief was filed by *Howard B. Eisenberg*, Milwaukee for the Wisconsin Association of Criminal Defense Lawyers.

¶ 1.   WILLIAM A. BABLITCH, J.   The question presented in these consolidated cases is whether evidence that is seized pursuant to a rule expounded by

this court must be suppressed when that rule is subsequently determined by the United States Supreme Court to be unreasonable under the Fourth Amendment.

¶ 2. We considered this identical issue in a separate case decided today, *State v. Ward*, 2000 WI 3, 231 Wis. 2d 723, 604 N.W.2d 517. For the reasons set forth in *Ward*, we conclude that the evidence seized at the home of Lisa Orta and Ricardo Ruiz is admissible evidence. Accordingly, the decision of the court of appeals is reversed.

¶ 3. The undisputed facts in this case are as follows. In February 1997 City of Racine police executed a no-knock search warrant at a home occupied by Lisa Orta. Orta and Ricardo Ruiz were present at the residence at the time the search warrant was executed. The officers seized 6.7 grams of marijuana, 3.7 grams of cocaine in one location and .2 grams of cocaine in another, two guns, a digital scale and other items. The defendants were each charged with violating various provisions of the Uniform Controlled Substances Act.[1]

¶ 4. Subsequent to the search and while the defendants' case was pending, the United States Supreme Court decided *Richards v. Wisconsin*, 520 U.S. 385 (1997). In *Richards*, the Court held it to be unreasonable under the Fourth Amendment to allow a *per se* exception from compliance with the rule of announcement[2] whenever a search warrant is exe-

---

[1] The Uniform Controlled Substances Act is contained in ch. 961 of the Wisconsin Statutes.

[2] The rule of announcement requires police to follow three steps prior to forcibly entering a home to execute a search warrant: announce their identity, announce their purpose and wait for the occupants to either open the door or refuse to admit the officers. *State v. Stevens*, 181 Wis. 2d 410, 423, 511 N.W.2d 591

cuted seeking evidence of felony drug delivery or dealing. This court had established this *per se* exception in *State v. Stevens*, 181 Wis. 2d 410 (1994) and *State v. Richards*, 201 Wis. 2d 845, 549 N.W.2d 218 (1996). Based upon the Supreme Court decision, the defendants in this case moved to suppress evidence seized by the police arguing that the police had made a no-knock entry that was constitutionally unreasonable. The State conceded that the officers' no-knock entry into the residence was not reasonable under *Richards*. The circuit court granted the defendants' motion to suppress evidence. The court of appeals summarily affirmed the suppression order. This court granted the State's petition for review pursuant to Wis. Stat. § (Rule) 809.62(1).

¶ 5.   In *Ward*, we considered the impact of the *Richards* decision on evidence seized while our rule in *State v. Richards* and *Stevens* was the law of the land. We concluded that evidence seized in compliance with our rule was admissible under both the Fourth Amendment of the United States Constitution and art. I, § 11 of the Wisconsin Constitution. Therefore, pursuant to our reasoning set forth in *Ward*, we conclude that the evidence seized in this case is also admissible.[3]

*By the Court.*—The decision of the court of appeals is reversed, and the cause is remanded to the circuit

(1994) (quoting *State. v. Cleveland*, 118 Wis. 2d 615, 622, 348 N.W.2d 512 (1984)).

[3] The State also argues that the exclusionary rule does not generally apply to evidence seized in the execution of a search warrant after a violation of the rule of announcement. As we noted in *State v. Ward*, 2000 WI 3, ¶ 46 n.7, 231 Wis. 2d 723, 604 N.W.2d 517, because defendants' motion to suppress is denied on other grounds, we need not address this issue.

court for further proceedings consistent with this opinion.

¶ 6. DAVID T. PROSSER, J. *(concurring).* Although I agree with the result reached by the majority in this case, I come to that result by a different route. This case can be decided without resort to any good faith exception to the exclusionary rule because the no-knock entry of the Orta residence was constitutional. Well settled law allows police to dispense with the rule of announcement if the officers have a reasonable suspicion that knocking and announcing would be dangerous, futile, or inhibitory to the criminal investigation. Because the officers had a substantial basis for their concerns in this case, I concur in the result but do not join the majority opinion.

## GOOD FAITH EXCEPTION TO EXCLUSIONARY RULE

¶ 7. This court's decision in *Hoyer v. State*, 180 Wis. 407, 193 N.W. 89 (1923), was a watershed in Wisconsin law. The case concerned the search of an automobile for illegal alcohol. Two officers detected the odor of alcohol in Hoyer's automobile after it had been in a collision. The officers searched the vehicle without a warrant; ultimately, this court, acting on the law as it stood at that time, held that the five bottles of liquor found were the result of an unlawful search and seizure. This court suppressed the evidence with an analysis that made Wisconsin one of the first states to adopt the exclusionary rule—almost 40 years before the Supreme Court applied the Fourth Amendment to

the states through the Fourteenth Amendment. *Mapp v. Ohio*, 367 U.S. 643 (1961).[1]

¶ 8.    In *Hoyer*, the court wrestled with the policy issues surrounding the suppression of probative evidence. It noted that several states had refused to examine the means by which such evidence was obtained and cited cases from Iowa, Nebraska, California, Georgia, Massachusetts, and North Dakota. The court then turned to cases from the Supreme Court, namely *Amos v. United States*, 255 U.S. 313 (1921), and *Gouled v. United States*, 255 U.S. 298 (1921), in which evidence obtained through unlawful searches had been suppressed. After examining several other cases from lower federal courts, the court listed five cases from Michigan and cases from Mississippi, Tennessee, Kentucky, and Wyoming that followed the federal exclusionary rule. Thereupon, the court said:

> For ourselves we elect to stand. . .with the federal and other courts which consider these provisions of the Bill of Rights as embodied in constitutions to be of substance rather than mere tinsel. We hold, therefore, that the evidence challenged in this case was taken by the officers by unlawful search and seizure and contrary to sec. 11, art. I, Wis. Const. and was improperly received in evidence against

---

[1] For a general history of the exclusionary rule and a discussion about how the Wisconsin rule offers more protection against unlawful searches and seizures than the federal exclusionary rule, *see* Charles David Schmidt, Comment, *But What of Wisconsin's Exclusionary Rule? The Wisconsin Supreme Court Accepts Apparent Authority to Consent as Grounds for Warrantless Searches*, 83 Marq. L. Rev. 299, 308–311 (1999).

him on the trial in violation of his rights under sec. 8, art. I, Wis. Const.[2] (Citation omitted.)

*Hoyer*, 180 Wis. at 415.

¶ 9.   The court declared that sec. 11, art. I of the Wisconsin Constitution is "a pledge of the faith of the state government" that all the people of the state "(with no express or possible mental reservation that it is for the good and innocent only), shall be *secure* in their persons, houses, papers, and effects against unreasonable search and seizure." *Id.* at 417.

> This security has vanished and the pledge is violated by the state that guarantees it when officers of the state, acting under color of state-given authority, search and seize unlawfully. The pledge of this provision and that of sec. 8 are each violated when use is made of such evidence in one of its own courts by other of its officers. That a proper result—that is, a conviction of one really guilty of an offense—may be thus reached is neither an excuse for nor a condonation of the use by the state of that which is so the result of its own violation of its own fundamental charter.

*Id.*

---

[2] Between 1870 and 1981, § 8, art. I of the Wisconsin Constitution read as follows:

SECTION 8. No person shall be held to answer for a criminal offense without due process of law, and no person for the same offense shall be put twice in jeopardy of punishment, nor shall be compelled in any criminal case to be a witness against himself. All persons shall, before conviction, be bailable by sufficient sureties, except for capital offenses when the proof is evident or the presumption great; and the privilege of the writ of *habeas corpus* shall not be suspended unless when, in cases of rebellion or invasion, the public safety may require it.

Historical Note, W.S.A. Const. art. I § 8 (West 1986).

¶ 10.  These strong words and others in the opinion have been subjected to exhaustive exegesis in subsequent cases. For instance, in *State v. Brady*, 130 Wis. 2d 443, 453, 388 N.W.2d 151 (1986), the court declared that in *Hoyer* "we adopted an exclusionary rule based upon the Wisconsin Constitution," and it noted that the "state urges us to adopt *Leon* and to overrule our holding in *Hoyer v. State*" (referring to *United States v. Leon*, 468 U.S. 897 (1984)).[3] Justice Abrahamson concurred in the decision, reasserting that the Wisconsin exclusionary rule is based upon the Wisconsin Constitution and is independent of an exclusionary rule imposed on the states by the federal constitution. *Id.* at 455. But Justice Steinmetz disagreed. He wrote in his concurrence that:

> It is not a proper statement that *Hoyer v. State* established the Wisconsin exclusionary rule grounded exclusively in the state constitution independent of the United States Supreme Court with respect to fourth amendment violations. . . .I emphasize that there is no basis in our prior decisions which indicates that art. I, sec. 11 provides broader protection than the fourth amendment. (Citation omitted.)

*Id.* at 459.

¶ 11.  Two years later in *State v. Tompkins*, 144 Wis. 2d 116, 423 N.W.2d 823 (1988), Justice Steinmetz wrote for a four-member majority:

> The protection of rights and the preservation of judicial integrity depend in reality on the deterrent

---

[3] Justice Ceci also disagreed with Justice Abrahamson's views in his own pointed concurrence. *State v. Brady*, 130 Wis. 2d 443, 461–63, 388 N.W.2d 151 (1986).

789

> effect of the exclusionary rule. Unlawful police con-
> duct is deterred when evidence recovered in
> unreasonable searches is not admissible in courts.
> The Wisconsin cases discussed in *Hoyer* and state-
> ments of that court all concerned judicial protection
> against police oppression. That is, the exclusionary
> rule developed as a judicial remedy to deter unrea-
> sonable searches and seizures. The fourth
> amendment was and is a limit on the powers of
> government.

*Id.* at 133–34.

¶ 12.  The question we should address in enter-
taining an exception to the Wisconsin exclusionary rule
is whether Justice Steinmetz was correct, that the
exclusionary rule is a mere "judicial remedy" subject to
periodic revision by courts and capable of tracking all
the exceptions crafted or recognized by the Supreme
Court; or, conversely, whether Chief Justice Abraham-
son is correct, that the rule embodies a fundamental
right embedded in the Wisconsin Constitution, a right
that is not automatically altered to incorporate federal
trends in criminal justice.

¶ 13.  The Steinmetz analysis in *Tompkins*, how-
ever attractive it may have been, was dictum in that
case. Moreover, his opinion was not correct in asserting
that "the interpretation of the Wisconsin Constitution
in *Hoyer* was based exclusively upon federal cases, par-
ticularly United States Supreme Court decisions
interpreting the fourth amendment." *Id.* at 135. On the
other hand, the *Hoyer* court proclaimed that "we elect
to stand. . .with the federal and other courts." *Hoyer*,
180 Wis. at 415. The court's use of the word "elect" is
quite at odds with a constitutional mandate. Moreover,
in light of modern search and seizure doctrine, the
*Hoyer* court was dead wrong on the question of whether

authorities could search an automobile without a warrant. The court failed to anticipate *Carroll v. United States*, 267 U.S. 132 (1925), and it made a point of disagreeing with the Michigan Supreme Court in *People v. Case*, 190 N.W. 289 (Mich. 1922), a case in which the court had grounded a decision upholding the search of an automobile on "the nature of the automobile and the extent to which it can be used as a means of crime." *Hoyer*, 180 Wis. at 414.

¶ 14.   *State v. Ward*, 2000 WI 3, 231 Wis. 2d 723, 604 N.W.2d 517, of even date, is a new watershed in Wisconsin law. It is a momentous event when this court throws over more than 75 years of precedent and yields to the persistent entreaties of the State to recognize a good faith exception to the exclusionary rule. That we should use the *Ward* case as the vehicle for declaring such an exception is an abomination, because it vindicates substandard police performance. That we should apply the new exception in this very different case is unnecessary and dangerous, because it implies that excellent police work was constitutionally deficient.

¶ 15.   It may be possible to support a limited good faith exception to the exclusionary rule in a worthy case, with compelling facts, in which the court carefully articulates a rationale that squares with the storied *Hoyer* decision. But not in *Ward* and not here.

## EXIGENCY EXCEPTION TO THE RULE OF ANNOUNCEMENT

¶ 16.   Under the circumstances of this case, police entry into the Orta residence without announcement was constitutional because police had reasonable suspicion that they were facing exigent circumstances.

¶ 17. The general reasonableness requirements of the Fourth Amendment govern the common law principle of announcement. *Wilson v. Arkansas*, 514 U.S. 927, 934 (1995). Although police ordinarily must knock and announce their identity and purpose before entering a dwelling, not every entry "must be preceded by an announcement." *Id.* The announcement principle is not "an inflexible rule requiring announcement under all circumstances." *Id.* Rather, the rule is sufficiently flexible to permit consideration of "countervailing law enforcement interests." *Id.*

¶ 18. The Supreme Court rejected this court's blanket exception to the knock-and-announce requirement for drug investigations in *Richards v. Wisconsin*, 520 U.S. 385 (1997). Nonetheless, the court upheld the unannounced entry in that case and allowed police to dispense with announcement when they have reasonable suspicion that an announcement would be dangerous or futile, or that it would inhibit the effective investigation of the crime by allowing suspects to destroy evidence. *State v. Meyer*, 216 Wis. 2d 729, 734–35, 576 N.W.2d 260 (1998) (citing *Richards*, 520 U.S. at 394).

¶ 19. Police can execute a no-knock search when they have a reasonable suspicion that, based on the particular facts, exigent circumstances exist. *Id.* at 751; *see also United States v. Ramirez*, 523 U.S. 65, 70, 73 (1998). Exigent circumstances exist when there is a reasonable belief, evaluated at the time of entry, that knocking and announcing will endanger the safety of the police or others. *Meyer*, 216 Wis. 2d at 746 n.17. Exigent circumstances also arise when it is likely that evidence will be destroyed, or when the announcement becomes superfluous because the occupants of the premises already are aware of the police presence. *Id.*

¶ 20. When they review the circumstances of unannounced entries, courts may consider the experience and training of police officers in combination with the particular facts. *Id.* at 752. In assessing an officer's experience, we look at his or her familiarity with similar situations, and how the officer's generalized knowledge may lead to reasonable inferences. *Id.* at 752 (citing *Terry v. Ohio*, 392 U.S. 1, 27 (1968)). Under the collective knowledge doctrine, there are situations in which the information in the hands of an entire police department may be imputed to officers on the scene to help establish reasonable suspicion or probable cause. *State v. Mabra*, 61 Wis. 2d 613, 625–26, 213 N.W.2d 545 (1974); *State v. Wille*, 185 Wis. 2d 673, 683, 518 N.W.2d 325 (Ct. App. 1994).

¶ 21. Usually, after a circuit court has upheld a no-knock warrant under the overturned blanket rule, an appellate court will remand the case to the circuit court for a new suppression hearing. *Meyer*, 216 Wis. 2d at 754; *State v. Ruiz*, 213 Wis. 2d 200, 214, 570 N.W.2d 556 (Ct. App. 1997); *State v. Ramirez*, 228 Wis. 2d 561, 570, 598 N.W.2d 247 (Ct. App. 1999). That is exactly what the court of appeals ordered in this case.

¶ 22. In my view, however, there already are sufficient facts in the record to show exigent circumstances, making a new hearing unnecessary. The officers had reasonable suspicion, based on the particular facts of the case, that the rule of announcement would lead to violence and possible injury, or the destruction of evidence.

¶ 23. The record reveals the following: Officer John Lucci brought 17 years of law enforcement experience and insight to the investigation of Ricardo Ruiz and Lisa Orta. At the time he prepared the affidavit for the search warrant, Officer Lucci was serving on the

Racine County Metro Drug Unit (MDU) as an investigative agent. Information in the possession of a division like the MDU may be imputed to officers making an arrest or executing a search warrant when the officers have the benefit of that information through communication with others in the unit and they rely on it. *See generally State v. Friday*, 140 Wis. 2d 701, 714–15, 412 N.W.2d 540 (Ct. App. 1987) (*overruled on other grounds, State v. Friday*, 147 Wis. 2d 359, 434 N.W.2d 85 (1989)).

¶ 24.  Prior to submitting the detailed affidavit for the warrant, Officer Lucci checked the MDU and Criminal Information Bureau files for information about Ruiz and Orta. The files contained information about "eleven different complaints against Ricardo Ruiz for drug trafficking since 1987." They showed he had been arrested on four prior occasions for delivery of cocaine. They indicated he had been convicted of two felonies related to cocaine and that Ruiz was on probation.

¶ 25.  Concerning Orta, the MDU files contained information about six different complaints against Orta for drug trafficking since 1987. The affidavit did not spell out the details of these six complaints, but one of them probably served as the basis for a search warrant of her residence in 1991.

¶ 26.  The 1997 search warrant for the Orta residence was obtained on February 8, 1997. The Racine County Sheriff's Department SWAT team executed the warrant on February 10, 1997, at 8:07 a.m. Deputy Sheriff Thomas Bauer was the first person through the door. The SWAT team included Detective Prochniak. Also present at the scene were Investigator Bellovary, Investigator Birkholz, Investigator Tharinger, Sergeant Ketterhagen, Agent Lucci, Agent Simons, Agent

Mich, and Agent Luedtke. According to the record, at least two of the named individuals, Investigator Birkholz and Investigator Tharinger, were officers with the City of Racine, a fact that underscores the cooperative nature of the Racine County Metro Drug Unit. At least two of the named individuals, Investigator Tharinger and Agent Mich, had previously executed search warrants involving Ricardo Ruiz and Lisa Orta.

¶ 27.   There were at least ten police officers at the residence when the warrant was executed, and the raid demonstrated both planning and extensive communication among the police agencies that make up the Racine County Metro Drug Unit. The officers must have discussed the previous search warrants for Ruiz and Orta. On these facts, the collective knowledge doctrine allows officers and their agencies to pool knowledge in determining reasonable suspicion to enter without announcement.

¶ 28.   Knowledge of the facts surrounding the August 1991 warrant and search is part of the information that may be imputed to all officers at the scene. In 1991, a reliable confidential informant accused the girlfriend of Ricardo Ruiz of selling cocaine from an apartment at 1623 Prospect Street in Racine. The girlfriend was Lisa Orta. The court issued a warrant to search her premises on August 5, 1991, and it was executed two days later. Officers observed four males sitting in lawn chairs on the front porch of the Orta residence. Ruiz was one of the four males. At the time, he was free on bond for previous cocaine charges. One of the males sitting next to Ruiz attempted to throw away a small white packet as the police approached. The packet was retrieved and determined to contain cocaine. Police found additional cocaine in the possession of this male. Police recovered $192 in cash from

795

the person of Ricardo Ruiz and found an additional $129 in cash inside, along with numerous food stamp coupons. They also found Ruiz's driver's license, and an order for Ruiz to attend a pretrial court hearing, in a bedroom dresser inside the apartment. In the same room, they found a gram scale commonly used to prepare and weigh controlled substances. Police discovered a plastic bag containing tetrahydrocannabinol (THC) in the apartment, along with numerous plastic bags, fireworks, and ammunition for a .38 special.

¶ 29.  Officer Lucci's affidavit for the 1997 warrant explains how a confidential informant purchased cocaine at the Orta residence in a carefully monitored, controlled buy within five days of the warrant application. The informant alleged that Ricardo Ruiz had a gram scale and packaging materials in his bedroom at the Orta residence, and that the informant had seen Ricardo Ruiz sell cocaine to other people within the previous two weeks at the house.

¶ 30.  Ruiz was present at Orta's residence in 1991 when the search warrant was executed. The affidavit for the 1997 warrant stated that the confidential informant claimed on the basis of personal observation that Ruiz and Orta both resided at 2606 Douglas Avenue, Racine, the premises to be searched. Two vehicles were present at the house at the time of the search. Consequently, Lucci and other officers had good reason to believe that two long-time drug dealers who were thoroughly familiar with the police and the criminal justice system would be present at the premises when they entered the building.

¶ 31.  In 1997, Ricardo Ruiz had two felony convictions involving cocaine and was on probation. He was steadily selling drugs. The police officers could

assume that Ruiz knew that his arrest would lead to the revocation of his probation. His conviction would likely produce a lengthy prison sentence. He was a repeat drug offender, a status that has the effect of doubling the minimum and maximum terms of imprisonment for any drug conviction. As a convicted felon, Ruiz could not possess a firearm and would be treated as a habitual offender if he were caught with one. Drug dealers often possess and use firearms, but the present case moves beyond generalities. This particular drug dealer possessed ammunition for a .38 special in 1991 only a few months after he had been the subject of a search warrant and while he was out on bond on drug charges. With this background, police had good reason to believe that this drug dealer would have firearms in 1997 and had motive to use them. That is why at least ten officers went to the residence, and why they waited until a juvenile male had left the premises for school before executing the warrant.

¶ 32.    The fact that the officers eventually seized a .32 caliber derringer in one bedroom and a Ruger semi automatic .9 millimeter handgun in the kitchen, plus a .9 millimeter magazine with two cartridges, did not itself establish reasonable suspicion for police to enter Orta's residence without announcement, but it did confirm the reasonableness of the officers' judgment. By contrast, in the *Ward* case, police were not dealing with a convicted felon, and they found no firearms at Ward's house.

¶ 33.    Even if Ruiz and Orta did not resort to violence, they were likely to attempt to destroy evidence. Lucci and the other officers could infer that Ruiz and Orta were familiar with the manner in which police execute search warrants. Both were long-time drug dealers facing substantial criminal sentences if con-

797

victed. Both had been the target of search warrants. Both were known to deal in powder cocaine. Cocaine is readily disposable, and experienced dealers like Ruiz and Orta can destroy it more easily than marijuana. *See State v. Kiekhefer*, 212 Wis. 2d 460, 478, 569 N.W.2d 316 (Ct. App. 1997). Police knew that in the 1991 MDU search, the suspect sitting next to Ruiz had tried to get rid of incriminating cocaine evidence. Police knew that Ruiz and Orta had motive and experience to destroy evidence if given the chance and that an announcement could well have "inhibit[ed] the effective investigation of the crime." *Richards*, 520 U.S. at 394.

¶ 34.  A combination of particular facts, such as the defendant's "apparent recognition of the officers combined with the easily disposable nature of the drugs," can justify a no-knock entry. *Meyer*, 216 Wis. 2d at 752 (citing *Richards*, 520 U.S. at 394). In this case the combination of particular facts more than supports the decision to dispense with the rule of announcement.

¶ 35.  Given the rich factual record here to support a no-knock entry, this is not the case in which to graft the good faith exception onto Wisconsin's exclusionary rule. The good faith exception very well may fuse elegantly with our exclusionary rule under a better set of facts, but not under the ones in this case. The decision of the court of appeals should have been reversed on the grounds that the no-knock entry was constitutional.

¶ 36.  I am authorized to state that CHIEF JUSTICE SHIRLEY S. ABRAHAMSON and JUSTICE ANN WALSH BRADLEY join the "GOOD FAITH EXCEPTION TO EXCLUSIONARY RULE" section of this concurrence.

¶ 37.   SHIRLEY S. ABRAHAMSON, Chief Justice *(dissenting)*. I dissent for the reasons stated in my dissenting opinion in *State v. Ward*, 2000 WI 3, 231 Wis. 2d 723, 604 N.W.2d 517, of even date.

¶ 38.   The majority opinion in *Ward* holds that evidence seized in an unconstitutional no-knock search may be admitted only when an officer relies in objective good faith on a pronouncement of this court. Thus a mere pronouncement of this court validating a no-knock search apparently is not adequate to admit the evidence. An officer's subjective good faith reliance on this court's pronouncement is not sufficient to admit the evidence. An officer's reliance in objective good faith on this court's pronouncement is needed to admit the evidence.

¶ 39.   An issue the majority opinion does not address in this case or in *State v. Ward* is what constitutes an officer's reliance in objective good faith on a pronouncement of this court.

¶ 40.   Can an officer rely in objective good faith on a pronouncement of this court when the U.S. Supreme Court has agreed to review this court's pronouncement and numerous state and federal courts have disagreed with this court's pronouncement? In February 1997 when the officers executed the unconstitutional no-knock entry into Ms. Orta's residence, the U.S. Supreme Court had already agreed to review this court's decision in *State v. Richards*.[1] *Richards* is the case that, according to the majority opinion, the officers had to rely upon in objective good faith.[2] Numerous federal and state decisions disagreed with this court's pronouncement in *Richards*. *See State v. Richards*, 201

---

[1] *See Richards v. Wisconsin*, certiorari accepted January 3, 1997, 519 U.S. 1052 (1997).

[2] *State v. Richards*, 201 Wis. 2d 845, 549 N.W.2d 218 (1996).

Wis. 2d at 871 n.6 (Abrahamson, J., concurring)(cases described).

¶ 41. The majority does not apply the "rely in objective good faith" standard. Why not? Is the standard meaningless?

¶ 42. I cannot join Justice Prosser's ruling on the exigency exception to the rule of announcement in this case without asking the parties to brief and argue this issue. The court of appeals remanded the case to the circuit court for a new suppression hearing to determine whether the officers had reasonable suspicion that exigent circumstances existed to justify dispensing with the rule of announcement. Nevertheless, I agree with his analysis of this state's exclusionary rule set forth in *State v. Hoyer*, 180 Wis. 407, 193 N.W. 89 (1923). I join that part of Justice Prosser's concurrence relating to the good faith exception to the exclusionary rule.

¶ 43. For the reasons set forth, I dissent.

¶ 44. I am authorized to state that JUSTICE ANN WALSH BRADLEY joins this dissent.